2000 ME 139

**STATE of Maine**

v.

**JOEL H.**

Supreme Judicial Court of Maine.

Submitted on Briefs May 25, 2000.

Decided July 18, 2000.

Geoffrey A. Rushlau, District Attorney, Patricia A. Mador, Asst. Dist. Atty., Wiscasset, for State.

William M. Avantaggio, Esq., Howard & Bowie, Damariscotta, for defendant.

1. Upon conviction, Joel was sentenced to the Maine Youth Center until the age of 20, all suspended, and two years of probation.

2. Title 17-A, section 255(1) provides, in part: A person is guilty of unlawful sexual contact if the person intentionally subjects another person to any sexual contact, and:

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Joel H., a juvenile, appeals from a judgment entered in the Superior Court (Lincoln County, *Atwood, J.*) affirming adjudications of the District Court sitting as the Juvenile Court (Wiscasset, *Westcott, J.*) that Joel had committed two acts of unlawful sexual contact.[1] *See* 17-A M.R.S.A. § 255(1)(C) (Supp.1999) (Class C).[2] On appeal, Joel argues (1) that there was insufficient evidence to support adjudications of guilt; (2) that the trial court erroneously curtailed Joel's cross examination of the victim; and (3) that the trial court erred in allowing the State to elicit hearsay testimony beyond the scope of the "first complaint rule." Because we conclude that there was sufficient evidence of the elements of unlawful sexual contact, and that any errors committed by the trial court were harmless, we affirm the judgment.

[¶ 2] The following testimony was elicited at trial. The twelve-year-old victim typically returned home from school at approximately 3:30 p.m. Ordinarily, the victim's cousin, who was living with the victim's family, was already at home when the victim arrived. On most days, the cousin was accompanied by Joel H., who was the cousin's boyfriend. The victim's father usually arrived home between 4:30 and 5:00 p.m., and her mother was usually home between 5:00 and 5:30 p.m.

[¶ 3] On January 5, 1998, before her parents returned home from work, the vic-

. . . .

C. The other person, not the actor's spouse, has not in fact attained the age of 14 years and the actor is at least 3 years older.

17-A M.R.S.A. § 255(1) (Supp.1999).

tim was in the living room with Joel, and her cousin was in the basement doing laundry. The victim testified to the following events:

> A Joel was laying on the couch, and he asked me to come sit by his feet, and I did, and he put his foot on my private area.
>
> Q Okay. And, when he did this, were his shoes on or—or off?
>
> A Off.
>
> . . . .
>
> Q And, exactly where did he touch you with his foot?
>
> A My virginia [sic].
>
> Q What happened next?
>
> A (Indiscernible)—I guess I sat there about five minutes, and then I got up. I don't recall after that.
>
> . . . .
>
> Q Did he ever say anything to you at that point? Did he ever ask you if you were mad at him on that day also?
>
> . . . .
>
> A [L]ater in the day ... I was upstairs ... and he asked me if I was mad at him, and I said "No."

The victim did not report the incident to anyone on January 5.

[¶ 4] On the following day, January 6, 1998, the victim again arrived home at 3:30 p.m. Her cousin and Joel were at the house, as was the victim's younger sister. The cousin, who worked at a McDonald's Restaurant in the area, left the house between 4:00 and 4:45 p.m. for work. The victim testified that after her cousin left, another incident occurred:

> He—Joel was layin' on the couch, and he asked me to come lay with him, and I did, and then he touched my virginia [sic], on the outside of my pants, and then he went un [sic] my underwear, then like immediately he asked me to go shut off the light, and I did, and then I went into the kitchen, I went out [sic]— back out to the living room to get my bag for my homework, and I—he saw my dad pull in.

The victim added that Joel had rubbed her genitals through her pants for one to two minutes and that he put his hand into her underpants and touched her genitals directly.

[¶ 5] Having seen the victim's father arrive, Joel again asked the victim if she was mad at him. When she said that she was, Joel replied, "Well, I'm sorry," and left the house.

[¶ 6] The victim's father testified that when he drove in the driveway at approximately 4:50 p.m., he noticed that the television was on and the living room "was fairly dark." Joel left before the father had unloaded his son from the car, and the father noted that when Joel left that evening "he left really fast, ... basically, a quick wave and took off." He also found it "a little strange" that Joel was at the house in the cousin's absence.

[¶ 7] That evening, the victim's mother called the father in to speak with the victim, and the victim explained the events that had occurred. At trial and over Joel's hearsay objection, the father testified regarding the events described to him by his daughter.

[¶ 8] The cousin testified that when she left for work, at 4:45 p.m., Joel was lying on the couch in the living room and he and the victim were watching a movie.

[¶ 9] Constance Hammer, a teacher at the victim's school, testified that she received an anonymous phone call from a parent who told her some details of the incident. The parent informed Hammer that the incident had occurred in a bedroom. Hammer could not remember if the victim had told her that the event happened in a bedroom, but Hammer was clear that the victim told her she had "gotten away and went upstairs to her room and waited for an adult to come home."

[¶ 10] Joel testified that when the father arrived home, he did not enter the house

immediately. Joel stated that when the credits began to roll on the movie he was watching, he left the house and said good-bye to the father as he walked past him in the driveway.

[¶ 11] Michael Heavener, a detective for the Waldoboro Police Department, testified, however, that Joel told him, in an interview conducted approximately one month after the incident, that when he left the residence, "there was approximately five to 10 minutes left in the movie, it hadn't finished yet."

[¶ 12] Joel was charged, as a juvenile, with two counts of unlawful sexual conduct. After a bench trial, the District Court found that Joel had committed both offenses. Joel's appeal to the Superior Court was unsuccessful. Joel then appealed to this Court.

## I. SUFFICIENCY OF THE EVIDENCE

[¶ 13] "When the Superior Court acts as an intermediate appellate court, we directly review the decision of the District Court." *Bangor Publ'g Co. v. Union St. Market,* 1998 ME 37, ¶ 5, 706 A.2d 595, 597. When a defendant challenges the sufficiency of the evidence, "we review the evidence in the light most favorable to the State to decide whether a factfinder rationally could find every element of the criminal charge beyond a reasonable doubt." *See State v. Hayes,* 675 A.2d 106, 109 (Me.1996).

[¶ 14] The State had the burden of proving (1) that Joel was not the victim's spouse; (2) that Joel was at least three years older than the victim; (3) that the victim was less than fourteen years old; and (4) that Joel intentionally subjected the victim to sexual contact. *See* 17-A M.R.S.A. § 255(1)(C) (Supp.1999). " 'Sexual contact' means any touching of the genitals or anus, directly or through clothing, other than as would constitute a sexual act, for the purpose of arousing or gratifying sexual desire or for the purpose of

causing bodily injury or offensive physical contact." 17-A M.R.S.A. § 251(D) (Supp. 1999).

[¶ 15] Joel contends that the State did not prove that Joel was not the victim's husband and that the State failed to prove that Joel acted with the requisite intent with respect to the January 5 incident. The trial court, however, had sufficient evidence of both elements to support an adjudication that Joel committed both offenses.

[¶ 16] The victim identified Joel as her cousin's boyfriend. There was also testimony that Joel lived in a different household than the victim and that the victim's father found it strange that Joel would be in the house in the cousin's absence. Finally, the court was permitted to consider the difference in age between the victim, who was twelve, and the defendant, who was at least old enough to drive. That evidence, when viewed in the light most favorable to the state, supports the conclusion that Joel was not married to the victim.

[¶ 17] The evidence also supports the conclusion that Joel intentionally subjected the victim to sexual contact on January 5. First, Joel requested that the victim sit next to him. Second, Joel placed his feet in contact with the victim's genitals. Third, Joel asked the victim later that evening if she was mad at him.

[¶ 18] Moreover, Joel's actions on January 6 can be construed to be strongly indicative that Joel touched the victim on January 5 "for the purpose of arousing or gratifying sexual desire." *See* 17-A M.R.S.A. § 251(D) (Supp.1999). Past, uncharged acts between a defendant and complainant can be admissible to show a defendant's intent to commit the crime with which he is charged. *Cf. State v. Young,* 560 A.2d 1095, 1096 (Me.1989). Joel's acts and statements on January 6, when viewed in the light most favorable to the State, are evidence that Joel's intent on January 5 was to touch the victim in a

sexual way. That the act revealing Joel's intent occurred *after* the incident does not detract from its evidentiary weight. The trial court's finding of the requisite intent was supported by the evidence.

## II. CROSS EXAMINATION

[¶ 19] The victim testified at trial that the January 6 incident occurred in the living room and that, when she got up to turn out the light, she left the room and went in to the kitchen. On cross examination, the victim testified that she remembered discussing the incident with a teacher at school but that she did not remember what she had told the teacher. At that point, Joel's attorney asked the victim if a certain document would refresh her memory, and he attempted to present the victim with a written statement, prepared by Detective Heavener, which indicated that the victim had told her teacher that the incident had occurred in a bedroom and that when the victim got up to turn off the light, she ran out of the room and locked herself in another room until a parent arrived. Before the victim could answer whether or not the document would refresh her recollection, the State objected, and the trial court refused to allow the document to be shown to the victim, concluding that the document "wouldn't necessarily refresh her memory."

[¶ 20] We have held that "generally, a witness may revive [her] memory and achieve a present recollection from any type of writing (or other article) which might tend to serve the purpose." *Cope v. Sevigny*, 289 A.2d 682, 687 (Me.1972); *see also United States v. DiMauro*, 614 F.Supp. 461, 466 (D.Me.1985) ("It is well established that on the laying of the prop-

er foundation, a witness may be permitted to use anything which the witness says will refresh [her] recollection as to the events to which [she] testifies."); M.R. Evid. 612(a).[3] There is nothing in our decisional law or M.R. Evid. 612(a) which requires that a party wishing to refresh the recollection of a witness must prove that the document will "necessarily" refresh recollection in order to be permitted to lay the foundation for the use of that document. Although the trial court erred in curtailing Joel's use of the document, the error was harmless.

[¶ 21] An error is harmless if "it is highly probable that the error did not affect the factfinder's judgment." *State v. Jordan*, 1997 ME 101, ¶ 8, 694 A.2d 929, 931. Here, Joel, through testimony at trial, was able to bring out the prior inconsistent statements of the victim revealed in the document. Detective Heavener testified that Constance Hammer, the victim's teacher, told him "that [the victim] had told her that they were up in a bedroom—Joel and [the victim] were in a bedroom, that Joel had asked [the victim] to turn the lights out, that she had gone to turn the lights out, and then fled the room, and then locked herself in a bedroom." Moreover, Hammer testified that though she could not remember whether the victim had told her that the events occurred in a bedroom, she did remember that an anonymous parent had reported to her that the events had occurred in a bedroom and that the victim's story corroborated the parent's account of the events. Joel's success in eliciting this evidence that the victim had made prior inconsistent statements renders harmless any error of the trial court in curtailing his cross examination of her.[4]

---

**3.** M.R. Evid. 612(a) provides, in part:

> If, while testifying, a witness uses a writing or object to refresh the witness's memory, an adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition in which the witness is testifying.

**4.** We also reject Joel's argument that the court, in refusing to allow him to show the document to the victim, denied him his constitutional right to cross examine his accuser. We have recognized a constitutional right of a defendant to cross examine a witness against him to establish facts that might undermine that witness's credibility. *See, e.g., State v.*

## III. THE FIRST COMPLAINT RULE

[¶ 22] Over a hearsay objection, the victim's father testified that the victim had reported the sexual abuse to him on January 6. He also described some of the details that the victim had reported, but he did not reveal the name of the person whom the victim accused of perpetrating the abuse. The trial court admitted the testimony on the grounds that the first complaint rule only bars testimony identifying the perpetrator. We agree with Joel's contention that the evidence admitted exceeded the limits of the first complaint rule.

[¶ 23] "The 'first complaint' rule allows hearsay statements concerning 'the bare fact that a complaint has been made but not further details.'" *State v. Tripp*, 634 A.2d 1318, 1321 (Me.1994) (quoting *State v. Palmer*, 624 A.2d 469, 471 (Me.1993)). The scope of the rule is very narrow and allows only the bare fact of the complaint to be admitted for the limited purpose of forestalling "'the natural assumption that in the absence of a complaint, nothing [untoward] had occurred.'" *See State v. Naylor*, 602 A.2d 187, 189 (Me.1992) (quoting *State v. True*, 438 A.2d 460, 464 (Me.1981)) (alterations in original). "Details of the complaint ... are irrelevant for this purpose and do not fall within the exception and, therefore, are not admissible." *Id.* The only details that are admissible are those necessary "to identify the complaint as being relevant to the charge on which the accused is being tried." *See State v. True*, 438 A.2d at 465.

[¶ 24] In this case, the father's testimony went beyond a mere statement that his daughter had made a complaint of sexual abuse. It did not simply corroborate the victim's testimony that she complained about the abuse shortly after it occurred; it also served to confirm other details of her in-court testimony. Consequently, the testimony beyond the limits of the rule was inadmissible and should have been excluded.

[¶ 25] The court's error, however, was harmless, because much of what the father testified to was brought out by other witnesses, *see State v. Collins*, 456 A.2d 362, 365 (Me.1983), and it is "highly probable" that, in the circumstances of this case, the remaining inadmissible evidence would not have "affected the factfinder's judgment," *see State v. Jordan*, 1997 ME 101, ¶ 8, 694 A.2d 929, 931. Moreover, because Joel's attorney, while cross examining the victim, implied that the victim had recently given a different account of the event, the evidence was also admissible as a prior consistent statement used "to rebut an express or implied charge against the declarant of recent fabrication." *See* M.R. Evid. 801(d)(1).

The entry is:

Judgment affirmed.

---

*Graves*, 638 A.2d 734, 737–38 (Me.1994). The trial court is required allow a defendant "'to expose to the jury the facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" *See State v. Larrabee*, 377 A.2d 463, 467 & n. 5 (Me.1977) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

Here, Joel wanted to use the prior inconsistent statement to impeach the victim, and the statement would have been admissible as impeachment evidence. *See State v. Pullen*, 266 A.2d 222, 225 (Me.1970) ("It is true that,

whenever a witness has testified to any material facts, his statements out of court ... which appear inconsistent with his present testimony are admissible in evidence for the purpose of impeaching his credibility."), *overruled or abrogated on other grounds by State v. Brewer*, 505 A.2d 774, 777 (Me.1985) *and State v. Nichols*, 1997 ME 178, ¶¶ 3–4, 698 A.2d 521, 521–22. Joel, however, never offered the statement for that purpose. Accordingly, the trial court "in no way prevented [him] from revealing the existence of inconsistent prior testimony." *See State v. Pullen*, 266 A.2d at 225.