2002 ME 26

**STATE of Maine**

v.

**Robert W. KALEX.**

Supreme Judicial Court of Maine.

Argued: Nov. 7, 2001.

Decided: Feb. 15, 2002.

Michael P. Cantara, District Attorney, Tara K. Bates, Assistant Dist. Atty. (orally), Alfred, for State.

Kevin R. Heffernan (orally), Portland, for defendant.

Panel: CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

DANA, J.

[¶ 1] Robert W. Kalex appeals from a conviction for terrorizing, 17–A M.R.S.A. § 210 (1983 & Supp.2000), entered by the Superior Court (York County, *Fritzsche, J.*) following a jury trial (York County, *Cole, J.*). Kalex contends that the court erred in refusing to admit evidence of victim Rory Holland's reputation for untruthfulness and in admitting a photograph of Kalex dressed in a Ku Klux Klan outfit. The State contends that the court did not abuse its discretion and that if there was any error, it was harmless. Because we conclude that the court exceeded the bounds of its discretion in refusing to admit certain reputation testimony, and because the error was not harmless, we vacate.

## I. BACKGROUND

[¶ 2] On July 25, 2000, Kalex was driving a red pickup truck with a passenger inside. Kalex pulled up beside Holland, who was

walking down the street, and said, according to Holland's trial testimony, that Holland "was lucky that [Kalex and the passenger] didn't have a gun right then or they would shoot [Holland]," while Kalex gestured like he was pointing a gun at Holland. According to Holland's testimony, Kalex's passenger told Holland he could "take that to the bank because that's a promise, not a threat." Holland reported the incident to the police, identified Kalex and described the truck and passenger, after which the police went to Kalex's home. When Kalex arrived, the police questioned him. During a heated conversation, Kalex referred to Holland as a "nigger," and stated he would not do anything to Holland, but his family "would take care of" Holland.

[¶ 3] The State charged Kalex with interference with Holland's constitutional and civil rights, 17 M.R.S.A. § 2931 (Supp. 2000), and terrorizing, 17–A M.R.S.A. § 210 (Supp.2000).[1] At the trial on the count of terrorizing,[2] the court admitted testimony that Kalex and others had approached Holland's house on October 31, 1999, wearing KKK outfits and carrying a sign from Holland's mayoral campaign; the sign was altered to display a drawing of a raccoon circled in red with a line through it. The court admitted a photograph of Kalex in a KKK outfit "for the limited purpose of the jury understanding the—the attire that the officer said was similar to what appears in that picture."[3]

[¶ 4] The court refused to admit evidence presented through voir dire regarding Holland's reputation for truthfulness. Theresa Ordway testified that "a few people had warned [her] that he wasn't a very nice guy," and that "he takes things that don't belong to him, that he lies about—he tells stories, he fabricates stories in order to get things that he wants." She testified that she based her testimony on what she heard from about fifteen people. Brian McLaughlin, a local business owner, stated that Holland "had caused problems or stolen merchandise" from local businesses and that other business owners told him Holland "tr[ied] to con things out of ... store[s], merchandise or anything." McLaughlin stated, however, that apart from hearing about Holland being manipulative and trying to strong-arm or con five to ten business people, McLaughlin "couldn't tell you about his reputation for truthfulness ...."

[¶ 5] Denise Everest, Kalex's girlfriend, stated that she had spoken with at least

---

**1.** The terrorizing statute provides, in pertinent part:

> **1.** A person is guilty of terrorizing if that person communicates to any person a threat to commit or to cause to be committed a crime of violence dangerous to human life, against the person to whom the communication is made or another, and the natural and probable consequence of such a threat, whether or not such consequence in fact occurs, is:
>
> > **A.** To place the person to whom the threat is communicated or the person threatened in reasonable fear that the crime will be committed ....

> 17–A M.R.S.A. § 210(1)(A).

**2.** Before trial, the court dismissed the count of interference with constitutional or civil rights on the ground that there was insufficient evidence to prove the elements of the claim.

**3.** The evidence conflicted regarding whether Kalex was the man in the photograph. Kalex testified that "[t]here's no identification on that picture that says that is me." He stated that he had never worn a KKK outfit before. By contrast, Biddeford police officer Roy Sherman testified that he had seen Kalex in the outfit after robed figures fled from Holland's residence, and Margie Berkovich, a detective at the Attorney General's office, testified that Kalex told her it was a ghost costume he wore held up by a pizza box so he could easily flip up the hood to drink.

fifty people in the greater Biddeford area who regarded Holland as untruthful. She also testified that, apart from those approximately fifty people, the Biddeford business community "had dishonest problems with him as far as products, services, and lack of payment." Thomas Kent testified that Holland was "manipulative" of local businesses according to the five to ten people with whom he had conversed about Holland. Kalex himself testified that Holland was "an extortionist," that he "lies and cheats and thieves," and that the newspapers had questioned Holland's honesty about obtaining signatures for "his electoral ballots." Kalex did not say how many people had communicated to him about Holland's reputation for untruthfulness.

[¶ 6] The court concluded that the above testimony, based on the witnesses' own observations or the observations of a number of business people regarding Holland's reputation for being a con man who strong-arms people or fails to pay them did not constitute evidence of his reputation in the community for truthfulness. The court stated:

> And to the extent that if five or 10 business people on Main Street have issues in regard to truthfulness, which I didn't even hear, but to the extent that wouldn't be a big enough community, clearly the defense has failed to meet its required standing to proceed with the— on the issue of character, and I am not going to permit the proposed inquiry about the defendant's reputation for truthfulness or veracity in the community on the basis of what has been presented by way of the voir dire here and these six witnesses.

[¶ 7] The jury convicted Kalex of terrorizing before the Superior Court (York County, *Fritzsche, J.*). Kalex filed his notice of appeal from the conviction, after which the court (York County, *Cole, J.*)

entered its judgment and commitment, sentencing Kalex to 364 days in jail with all but 120 days suspended, plus a year of probation.

## II. DISCUSSION

### A. KKK Photograph

[¶ 8] Kalex contends that the court abused its discretion when it admitted a photograph of him in a KKK outfit because the photograph's prejudicial nature substantially outweighed its probative value. He contends that the jurors did not need a photograph to know what a KKK uniform looks like, and that the image was inflammatory. He contends the admission of the photograph was not harmless error.

[¶ 9] The State contends that the photograph was probative of whether Kalex placed Holland "in reasonable fear that the crime w[ould] be committed." 17-A M.R.S.A. § 210(1)(A). The State also contends that, if the court erred in admitting the photograph, the error was harmless because the record contains other evidence of Kalex's racism.

■ [¶ 10] We review a court's determination of the admissibility of a photograph pursuant to Rule 403 for an abuse of discretion. *State v. Francis*, 539 A.2d 213, 215 (Me.1988).

■ [¶ 11] Rule 403 of the Maine Rules of Evidence provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." A photograph is admissible if it truly and accurately depicts what it purports to represent, is relevant to some issue involved in the litigation, and its probative value is not outweighed by any tendency it may have toward unfair

prejudice. *State v. Plante,* 623 A.2d 166, 167 (Me.1993).

[¶ 12] We stated that an array of "mug shots" including a photograph of the defendant was inadmissible pursuant to Rule 403 because it had "an undue tendency to move the jury to convict [the defendant] on the improper basis of his criminal record." *State v. Almurshidy,* 1999 ME 97, ¶ 17, 732 A.2d 280, 285; *see also State v. Robbins,* 666 A.2d 85, 87–88 (Me.1995) (holding that the court erred in admitting a photographic array because there were no identification issues relating to the array and the "mug shot" of the defendant unfairly besmirched his character). We also held that a court erred in admitting a gruesome photograph of a victim when the "essential evidentiary value in the photograph [was] tenuous in the extreme" because it did not advance any material facts beyond the trial testimony and there was no dispute concerning identification. *State v. Conner,* 434 A.2d 509, 512–13 (Me.1981). By contrast, when a photograph of a victim had "slight evidentiary value," but was not gruesome, we held that it was within the court's discretion to admit the photograph early in the trial before it was clear the defendant would not dispute the cause of death. *State v. Joy,* 452 A.2d 408, 412–13 (Me.1982).

■ [¶ 13] We conclude that in the circumstances of this case the admission of the photograph was not so unfairly prejudicial that it was beyond the scope of the court's discretion to admit it for its probative value in determining whether Kalex's behavior in 1999 contributed to a reasonable fear on Holland's part that Kalex would act on his July 25, 2000, threat. The photograph was not gruesome and did not suggest any convictions or other acts unsupported by testimony.

**B. Reputation Testimony**

[¶ 14] Kalex contends that the court should have admitted the testimony of five witnesses that Holland had a reputation for untruthfulness. According to Kalex, the error is not harmless because, as a result, the jury was not permitted to hear any testimony to undermine Holland's credibility.

[¶ 15] The State contends that the court did not abuse its discretion in refusing to admit the evidence of untruthfulness because only one person spoke of Holland being untruthful, "as opposed to being manipulative, dishonest, or just generally disliked." The State further contends that any error was harmless because other witnesses corroborated Holland's testimony.

■ [¶ 16] Rule 608(a) of the Maine Rules of Evidence provides, in pertinent part, that "[t]he credibility of a witness may be attacked or supported by evidence of reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness ...." The Maine rule, unlike the federal rule, "does not permit character evidence in the form of the witness' own opinion." *State v. Cyr,* 2001 ME 35, ¶ 8, 767 A.2d 307, 310; Fed.R.Evid. 608; *see also Inhabitants of Phillips v. Inhabitants of Kingfield,* 19 Me. 375, 379 (1841) (stating, even before the adoption of the rule, that "[t]o permit the opinion of a witness, that another witness should not be believed, to be received and acted upon by a jury, is to allow the prejudices, passions, and feelings of that witness to form, in part at least, the elements of their judgment"). "Nor does Rule 608 authorize opinion evidence of untruthfulness based on prior instances of conduct." Field & Murray, *Maine Evidence,* § 608.1 (2000 ed.). A person is truthful if he provides "a fully accurate account of events." BLACK's LAW DICTIONARY 1520 (7th ed.1999).

[¶ 17] Evidence regarding reputation " 'must embody the collective judgment of the community and must be derived from a group whose size constitutes an indicium of inherent reliability.' " *State v. Ricker*, 2001 ME 76, ¶ 6, 770 A.2d 1021, 1024 (quoting *State v. Mazerolle*, 614 A.2d 68, 73 (Me.1992)). The community in which the impeached party has the reputation for untruthfulness must be sufficiently large; "[i]f the group is too insular, its opinion of the witness' reputation for truthfulness may not be reliable because it may have been formed with the same set of biases." *Id.*

[¶ 18] Although we have not provided a specific definition of what constitutes a sufficiently large and diverse community, we have held that reputation testimony was admissible that was derived from knowledge of a fifty-person sample. *State v. Rytky*, 476 A.2d 1152, 1154–55 (Me. 1984). In addition, we have made clear that reputation testimony may be offered by a person who has knowledge of a witness in only one sphere of that person's life. *State v. Lambert*, 104 Me. 394, 398–99, 71 A. 1092, 1093–94.[4] "[A] man may have one reputation in the suburb of his residence and another in the commercial or industrial circles of his place of work.... There is no reason why the law should not recognize this." *Id.*, 104 Me. at 398, 71 A. at 1093 (internal quotation marks omitted). We stated that the defendant's "general reputation as to honesty may have been better established and more definitely understood in the community where the witnesses [rather than the defendant] lived and where they had numerous business dealings with him." *Id.* (internal quotation marks omitted).

[¶ 19] By contrast, we have held that reputation testimony is inadmissible when the community of which the witness testifies is a four-person neighborhood sample, *State v. Kim*, 2001 ME 99, ¶ 5, 773 A.2d 1051, 1054; certain members of a child's family on her father's side, *Ricker*, 2001 ME 76, ¶¶ 7–8, 770 A.2d at 1024; a small and discrete group of friends, *State v. Cyr*, 2001 ME 35, ¶¶ 8–9, 767 A.2d at 310; a six-person neighborhood sample, *Mazerolle*, 614 A.2d at 73; or a child's small community of two or three teachers, *State v. Walker*, 506 A.2d 1143 (Me.1986).

[¶ 20] "The burden is on the proponent of reputation evidence to satisfy the foundational requirements of such evidence including the requirement that the community be sufficiently large and diverse to give the reputation evidence the reliability required for admissibility." *Ricker*, 2001 ME 76, ¶ 8, 770 A.2d at 1024. We review the exclusion of reputation evidence for an abuse of discretion. *Id.* ¶ 3, 770 A.2d at 1023.

[¶ 21] Without addressing the purported reputation evidence offered by Ordway, McLaughlin, Kent and Kalex, himself, Everest testified that she spoke with approximately fifty people in the greater Biddeford area who stated Holland was untruthful. The court exceeded the bounds of its discretion in concluding that Everest's testimony about Holland's reputation in the broader community lacked sufficient indicia of reliability to establish a foundation for admissibility. Although Everest is Kalex's girlfriend, which might undermine her credibility, such credibility determinations are properly within the province of the factfinder and go to the weight of the testimony as opposed to its

---

4. The evidence of the defendant's reputation for truthfulness in the business community in *Lambert* was relevant to the larceny charge brought against him and was not offered as impeachment evidence; the court's reasoning regarding the reliability of such reputation testimony may nonetheless be applied in the present case.

admissability. *See In re Amberley D.,* 2001 ME 87, ¶ 21, 775 A.2d 1158, 1165.

[¶ 22] "An error is harmless if it is highly probable that the error did not affect the factfinder's judgment." *State v. Joel H.,* 2000 ME 139, ¶ 21, 755 A.2d 520, 525 (internal quotation marks omitted). We cannot say that the court's error in refusing to admit this reputation testimony was harmless because Holland was the only person who testified regarding the statements Kalex made when he pulled his truck over. Because Kalex was not permitted to impeach the credibility of the only witness who testified about the threat, a necessary element of terrorizing, the court's error was not harmless.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.

ALEXANDER, J., files a dissenting opinion.

ALEXANDER, J., dissenting.

[¶ 23] I respectfully dissent, but only from that portion of the Court's opinion that vacates the conviction and holds that the trial court erred in excluding the part of Denise Everest's testimony offered to attack the victim's character.

[¶ 24] In discussing the applicability of M.R. Evid. 608(a), the Court's opinion appropriately cites with approval *Inhabitants of Phillips v. Inhabitants of Kingfield,* 19 Me. 375, 379 (1841), where we observed, one hundred and sixty years ago, that "[t]o permit the opinion of a witness, that another witness should not be believed, to be received and acted upon by a jury, is to allow the prejudices, passions and feelings of that witness to form, in part at least, the elements of their judgment." That advice is particularly important for a trial court to respect, as the trial court respected it

here, where a central issue in the case is racial prejudice.

[¶ 25] The record establishes that Denise Everest was Robert Kalex's girlfriend. She harbored a long standing hatred towards the victim, Rory Holland, ultimately convincing Kalex to exclude Holland from Kalex's business. On the night of the incident, Everest was confrontational with the police, being "highly intoxicated and highly agitated." During this confrontation, according to Kalex's own testimony, Everest referred to the victim as a "nigger." In the offer of proof to support her attack on the victim's character, Everest asserted that "at least 200, maybe more, people" had come to her for help regarding the victim: "And a lot of people I knew and a lot of people I didn't know, they were strangers." Why 200 people—many of them strangers, would seek her help regarding the victim, or anyone else, was not indicated. When asked how many people had talked to her about the victim being untruthful, she stated: "Quite a few, more than 50. I can't put a total number and I'm myself one of those people that came to the conclusion." When asked if these opinions were of people within the Biddeford community, Everest answered: "Most of them, Saco, Old Orchard. I found a few that was in Portland."

[¶ 26] Kalex, as the proponent of the reputation evidence, had the burden to demonstrate that Everest's testimony was reliable and representative of the community's collective judgment. "The burden is on the proponent of reputation evidence to satisfy the foundational requirements of such evidence including the requirement that the community be sufficiently large and diverse to give the reputation evidence the reliability required for admissibility." *State v. Ricker,* 2001 ME 76, ¶ 8, 770 A.2d 1021, 1024. *See also* Field & Murray, *Maine Evidence* § 405.2 at 149–50 (2000 ed.).

[¶ 27] Admission of reputation evidence is usually addressed pursuant to M.R. Evid. 404(a), 405, or 608(a). That reputation evidence is really opinion testimony, summarizing the collective hearsay opinions of others. As such it is lay opinion testimony also subject to M.R. Evid. 701.[5] As a prerequisite to admission of such opinion testimony, trial courts must make a preliminary assessment of the reliability of that evidence.

[¶ 28] We have repeatedly stated that a trial court must address reliability in evaluating an offer of opinion of reputation evidence. *See Ricker*, 2001 ME 76, ¶¶ 6, 8, 770 A.2d at 1024; *State v. Cyr*, 2001 ME 35, ¶ 8, 767 A.2d 307, 310; *State v. Mazerolle*, 614 A.2d 68, 73 (Me.1992). In *State v. Brown*, 592 A.2d 163, 165 (Me.1991), we vacated a conviction because a trial court did not, in our view, properly exercise its discretion and attempt to assess the reliability of opinion testimony offered on a character issue.

[¶ 29] Evaluation of reliability is separate and distinct from the jury's determination of credibility. When opinion of reputation evidence is offered, the trial judge

> may test the trustworthiness of proffered character evidence by requiring [the proponent of the evidence] to establish preliminarily that the witnesses are aware of the [person's] reputation for a specific pertinent character trait and not simply aware of his ... reputation in general, and that the witnesses' knowledge of the ... character trait is representative of the community's collective judgment. The trial court's determinations on these foundation issues will be

reviewable only for an abuse of discretion.

Field & Murray, *Maine Evidence* § 405.2 at 150 (2000 ed.). *See also Ricker*, 2001 ME 76, ¶¶ 6, 8, 770 A.2d at 1024. This is consistent with the general view that where opinion evidence is offered, the trial court must act as a "gatekeeper"[6] to preliminarily determine that there is a rational basis for the opinion, M.R. Evid. 701(a), or that it is "both relevant and reliable." *See In re Jon N.*, 2000 ME 123, ¶ 9, 754 A.2d 346, 349; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

[¶ 30] After hearing Kalex's offer of reputation evidence, the court excluded it as insufficient. The court stated no specific findings as to Everest's testimony, and none were requested. Upon review of a ruling where no findings were stated or requested, we assume that the court found the facts necessary to support its decision. *State v. Porter*, 1997 ME 74, ¶ 5, 693 A.2d 743, 744. Because Kalex had the burden of demonstrating a sufficient foundation to admit Everest's testimony, the trial court's finding that Kalex's burden had not been met can only be overturned if a contrary finding is compelled by the evidence. *See State v. Pulsifer*, 1999 ME 24, ¶ 14, 724 A.2d 1234, 1238; *see also Westleigh v. Conger*, 2000 ME 134, ¶ 12, 755 A.2d 518, 520.

[¶ 31] Certainly this record does not compel a finding that Everest's testimony reflected the opinions of a "community sufficiently large *and diverse* to give the reputation evidence the reliability required for admissibility." *Ricker*, 2001 ME 76, ¶ 8,

---

5. **RULE 701. OPINION TESTIMONY BY LAY WITNESSES**

   If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness

and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

6. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**1294**

770 A.2d at 1024 (emphasis added). Within the record, it is unclear exactly how many of Everest's fifty person sample, whom Everest claims had come to her, were of the Biddeford community, how diverse the sample was, how many were individuals she knew, how many were "strangers," and how many were exaggerations fueled by hate.

[¶ 32] The Court's opinion states as the standard for admissability of opinion of reputation evidence under M.R. Evid. 608(a) that it "must embody the collective judgment of the community and must be derived from a group whose size contributes an indicium of inherent reliability." *Supra* ¶ 17 (citing *State v. Ricker*, 2001 ME 76, ¶ 6, 770 A.2d 1021, 1024 [7] and *State v. Mazerolle*, 614 A.2d 68, 73 (Me.1992)). Here, the nature of the "community" whose collective judgment was being evaluated was at best speculative; strangers, or known individuals from Portland, Biddeford, Saco, or Old Orchard Beach. Who these individuals were, and how diverse or representative of the community's collective judgment they were, was not explored in the offer of proof of Everest's testimony.

[¶ 33] With such a speculative community and the obvious bias and hatred of the witness offering the testimony, the trial court acted fully within the bounds of its discretion in concluding that Everest's testimony had an insufficient "indicium of inherent reliability." To suggest otherwise would be to permit any witness, no matter how biased, to offer character assassination testimony, based on a community no matter how vaguely defined, as long as the witness states a big number in describing the "community" with which she alleges to have had contact.

[¶ 34] M.R. Evid. 608(a) is not a license to bring prejudice and hate into the courtroom in the guise of reputation evidence. For that reason, the trial court must perform an independent analysis of the reliability of such testimony looking to both the size and the diversity of the community upon which it is allegedly based. *See* M.R. Evid. 403, 405, 608(a), 701; *Ricker*, 2001 ME 76, ¶¶ 6, 8, 770 A.2d at 1024. In this emotionally charged case, the trial court performed such an analysis commendably. It committed no error in excluding Everest's testimony. I would affirm the judgment.

---

7. Paragraph 8 in *Ricker* states the diversity element of the "representative of the community" requirement.