2009 ME 7

**STATE of Maine**

v.

**Tina BICKART.**

Supreme Judicial Court of Maine.

Argued: Sept. 16, 2008.
Decided: Jan. 20, 2009.

184

Clifford B. Strike, Esq. (orally), Strike, Goodwin & O'Brien, Portland, ME, for Tina Bickart.

Mark W. Lawrence, District Attorney, Justina McGettigan, Asst. Dist. Atty., Anne Marie Pazar, Contract Brief Writer (orally), Prosecutorial District, Alfred, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, MEAD, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and ALEXANDER, LEVY, and GORMAN, JJ.

Dissent: CLIFFORD, and MEAD, JJ.

LEVY, J.

[¶ 1] Tina Bickart appeals from a judgment of conviction of gross sexual assault (Class A), and related sexual crimes, entered after a jury trial in the Superior Court (York County, *Fritzsche, J.*). Bickart asserts that the court erred by: (1) failing to exclude the testimony of the State's expert palm print identification witness; (2) admitting into evidence nude

photographs of Bickart and her husband taken prior to the commission of the crimes; and (3) failing to exclude the testimony of her husband, Stephen, regarding marital communications. She also argues that there was insufficient evidence to support a conviction. We affirm the judgment.

## I. BACKGROUND

[¶ 2] The circumstances giving rise to Bickart's indictment are particularly heinous and disturbing. Viewing the evidence in the light most favorable to the State as required by the applicable standard of review, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Pierce,* 2006 ME 75, ¶ 16, 899 A.2d 801, 804.

[¶ 3] In April 2005, the victim, a two-year-old girl who lived next door to Bickart and her husband, spent the night at the Bickarts' apartment. On that night, after Bickart's husband, Stephen, returned home from his job, he and Bickart used marijuana and cocaine and drank alcohol. Bickart told her husband that she had a gift or present for him later on, and later that night she told him to go into the bedroom and "get ready." Stephen went into their bedroom and undressed; Bickart then entered the bedroom naked, carrying the two-year-old victim, who was also naked. Bickart and her husband had previously discussed their sexual fantasies involving children.

[¶ 4] Bickart put the victim on the bed or in a chair in the bedroom and then inserted her finger into the victim's vagina. Bickart then had Stephen join them on the bed, and assisted Stephen in having anal intercourse with the victim. Bickart and Stephen both took photographs throughout these assaults with their digital camera.

[¶ 5] Some weeks later, on June 11, 2005, Sanford Police Officer Richard Bucklin was dispatched to Bickart's apartment. Bickart had called the police to file a complaint against Stephen, from whom she was separated at the time, because he had been calling her all day. Officer Bucklin called Stephen and told him to stop calling Bickart and to handle their problems through divorce proceedings.

[¶ 6] Approximately an hour after Officer Bucklin left Bickart's apartment, Stephen arrived at the Sanford Police Department and told Bucklin that Bickart had threatened to go to the police and accuse him of sexually abusing Bickart's oldest daughter, who was twelve at the time. Stephen stated that this accusation was false, but that he had something else to tell the officer and handed him a floppy disk. Stephen told Bucklin that he had found the disk in his bag while packing to leave his and Bickart's apartment when they separated, and that the disk contained two pictures: one of his wife's finger penetrating the victim, and one of the victim laying with her head on a pillow and crying. Stephen mentioned at some point that he might have been involved in the events depicted in the photographs, and after waiving his *Miranda* rights, Stephen gave his account of the sexual abuse of the victim, including Bickart's role in the abuse. Stephen was thereafter arrested and eventually pled guilty to attempted gross sexual assault and two lesser offenses for his involvement in the abuse, resulting in a sentence of six and a half years in prison, and six and a half years of probation.[1] Bickart was also arrested.

### A. Procedural Background and Trial

[¶ 7] Bickart was charged by indictment with six offenses for her involvement

1. There was some dispute among the attorneys (to which the jury was not privy) over whether Stephen had in fact received a re-

duced sentence in conjunction with his testimony against Bickart. It was agreed that Bickart could tell the jury that there had been

in the sexual abuse of the victim: (1) unlawful sexual contact (Class B); (2) gross sexual assault (Class A); (3) endangering the welfare of a child (Class D); (4) sexual exploitation of a minor (Class B); (5) possession of sexually explicit materials (Class C); and (6) conspiracy to commit gross sexual assault (Class B).[2]

[¶ 8]  Prior to trial, Bickart filed a motion to exclude the testimony of the prosecution's expert witness, Edgar (Ron) Smith.  Smith was expected to testify that, utilizing palm print analysis techniques, he concluded that it was Bickart's hand penetrating the victim in the photograph of the assault.  In an evidentiary hearing, Bickart argued that this testimony was unreliable, as this was the first time Smith or anyone else had attempted an identification using only palm creases (the lines that develop across the palm) without the accompanying friction ridges (the detailed patterns on a person's palm and fingers used in fingerprint identification), and where the medium was a photograph and not a latent print.  Bickart also presented her own expert, Gregory Michaud, who testified that crease-only identification was not a generally accepted technique in the relevant scientific field and was not aware that it had ever been subject to peer-reviewed research.  The court, applying the standard from *State v. Williams*, 388 A.2d 500 (Me.1978), found that Smith's testimony was sufficiently reliable and that it should be left to the jury to decide the weight to be given to his conclusions. Both experts subsequently testified at trial.

[¶ 9]  Initially Bickart also moved to exclude nude photographs depicting her, and separately her husband, in erotic poses that they had taken of one another prior to the incident at issue.  At trial, she did not object to the admission of nude photographs she had taken of her husband.  She argued that the photographs of her constituted improper character evidence and that the danger of unfair prejudice outweighed any possible probative value. The court determined that the photographs were admissible as relevant evidence that Bickart and her husband were involved in taking photographs of their sexual practices, and that they were probative of whether Bickart had participated in the taking of the photographs of the incident in question.  Further, the court found that any danger of unfair prejudice was minimized by limiting the number of photos to be admitted.

[¶ 10]  At the same hearing, Bickart also argued that the testimony of her husband should be excluded based on the marital privilege.  In denying this motion, the court found that the privilege did not extend to ongoing criminal activity.

[¶ 11]  After a jury trial, Bickart was found guilty of all counts.  She was sentenced to concurrent terms of imprisonment resulting in an ultimate sentence of eighteen years, with all but fifteen years suspended, and four years of probation. This appeal followed.

## II.  DISCUSSION

### A.  Expert Testimony

■ [¶ 12]  Bickart contends that Smith's testimony should not have been

---

a plea agreement.  The jury was also informed that Stephen was granted immunity from charges in connection with deleted photographs (depicting Stephen molesting the victim) later found on the same disk as a condition for testimony against Bickart.

2.  The court dismissed the criminal conspiracy count after the State rested, finding that the count was insufficiently pled in the indictment.

admitted at trial because it represented a novel application of a methodology, normally utilized to analyze friction ridges in latent prints for fingerprint and palm print identification, to instead analyze palm creases in a photograph. This application allowed Smith to make an identification of a hand using only its creases. Friction ridges are the tiny ridges found throughout the hand, the imprint of which can be used to identify a person depending on the level of detail available. Creases are similarly found throughout the underside of the hand, and can be used by examiners of friction ridges to help orient the print (i.e. to determine the correct up and down position and spatial relationship of the ridges). Bickart asserts that the use of creases for identification purposes without accompanying ridge detail is not generally accepted and has not been subject to peer-reviewed research. It is undisputed that this approach has never been previously recognized as a basis for an expert opinion in a published decision from an appellate court in any jurisdiction. Our analysis begins by: (1) defining the standards that govern a trial court's decision whether to admit expert opinion testimony and our appellate review of the same; and then turns to consider (2) the record evidence pertaining to the palm print analysis at issue in this case; (3) the trial court's evaluation of that evidence; and (4) our appellate review of the trial court's discretionary decision to admit the expert's opinion.

### 1. Applicable Standard

[¶ 13] The standard governing the admission of an expert witness's opinion is grounded in the Maine Rules of Evidence. Rule 402 provides that "[a]ll relevant evidence is admissible," except as otherwise limited by the Rules. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R. Evid. 401. In addition, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." M.R. Evid. 702.

[¶ 14] The genesis of the test for determining whether expert testimony is admissible was our decision in *State v. Williams*, 388 A.2d 500 (Me.1978). We held that the "proponent of expert testimony must establish that (1) the testimony is relevant pursuant to M.R. Evid. 401, and (2) it will assist the trier of fact in understanding the evidence or determining a fact in issue." *Searles v. Fleetwood Homes of Pa., Inc.*, 2005 ME 94, ¶ 21, 878 A.2d 509, 515–16 (citing *Williams*, 388 A.2d at 504). Before engaging in this two-prong inquiry, the trial court must make a preliminary finding that the testimony meets a threshold level of reliability. *Id.* ¶ 22, 878 A.2d at 516. "[W]here expert testimony rests on newly ascertained, or applied, scientific principles, a trial court may consider whether the scientific matters involved in the proffered testimony have been generally accepted or conform to a generally accepted explanatory theory in determining whether the threshold level of reliability has been met." *Id.* (quotation marks omitted). Nevertheless, a finding of general acceptance is not required. *Id.*

[¶ 15] Instead, the question is whether the court is satisfied "that the proffered evidence is sufficiently reliable to be held relevant." *Id.* In *Searles*, we noted that the factors that may be consid-

ered to make this threshold determination include:

> (1) whether any studies tendered in support of the testimony are based on facts similar to those at issue; (2) whether the hypothesis of the testimony has been subject to peer review; (3) whether an expert's conclusion has been tailored to the facts of the case; (4) whether any other experts attest to the reliability of the testimony; (5) the nature of the expert's qualifications; and (6), if a causal relationship is asserted, whether there is a scientific basis for determining that such a relationship exists.

*Id.* ¶ 23, 878 A.2d at 516 (quotation marks and citations omitted, numbers added). We review a trial court's preliminary finding that expert testimony is sufficiently reliable for an abuse of discretion.[3]

> Review of an exercise of discretion involves resolution of three questions: (1) are factual findings, if any, supported by the record according to the clear error standard; (2) did the court understand the law applicable to its exercise of discretion; and (3) given all the facts and applying the appropriate law, was the court's weighing of the applicable facts and choices within the bounds of reasonableness.

Alexander, *Maine Appellate Practice* § 418 at 233 (2008) (citation omitted).

2. Evidence Pertaining to the Palm Crease Analysis

[¶ 16] At an evidentiary hearing held prior to the trial, Smith testified to his professional background as a latent print examiner, and explained that he had done extensive research on palm crease analysis. Smith testified that although he often uses the creases of a palm as a means of identification, as do all print examiners, there is usually accompanying friction ridge detail to aid in the identification. Smith testified that the photographs sent to him for evaluation in this case exhibited no friction ridge detail. This case also represented the first time Smith had been asked to identify a palm using only a photograph of the hand itself as opposed to a latent print. Smith testified that the analytical methodology he employed—the ACE-V method—to reach his conclusion that it was Bickart's hand in the photograph was "a standard methodology that's

---

3. We have on occasion stated that the threshold finding of the reliability of expert testimony by a trial judge is reviewed for clear error. *See, e.g., Tolliver v. Dep't of Transp.,* 2008 ME 83, ¶ 29, 948 A.2d 1223, 1233; *Searles v. Fleetwood Homes of Pa., Inc.,* 2005 ME 94, ¶ 24, 878 A.2d 509, 516 (citing *State v. Pineo,* 2002 ME 93, ¶ 6, 798 A.2d 1093, 1096). We applied the clear error standard when reviewing trial judges' determinations of the reliability of blood alcohol tests. *See Pineo,* 2002 ME 93, ¶ 6, 798 A.2d at 1096; *State v. Harnisch,* 607 A.2d 527, 529 (Me.1992). Thus it is worth noting that the Court has in the past found an implied legislative policy that blood tests are presumptively admissible unless proven unreliable. *See, e.g., State v. Poulin,* 1997 ME 160, ¶ 13, 697 A.2d 1276, 1279. In cases prior to *Searles* that did not involve blood tests, the standard used tended to be abuse of discretion. *See, e.g., State v. Irving,* 2003 ME 31, ¶¶ 14–17, 818 A.2d 204, 208–09; *State v. Preston,* 581 A.2d 404, 407 (Me.1990). In general, the clear error standard is used to evaluate a court's factual determinations. By contrast, "[b]ecause ... [the] admissibility of evidence frequently involves the weighing of probative value against considerations militating against its admissibility ... the decision to admit evidence is more frequently reviewed under an abuse of discretion standard." *State v. Dechaine,* 572 A.2d 130, 133 (Me. 1990). In this case, an evaluation of the reliability of expert testimony is less factual in nature and instead requires the court to weigh various factors, such as those outlined in *Searles,* and make a decision similar to that of admissibility. Thus, we rely on case law prior to *Searles* and conclude that an abuse of discretion standard is more appropriate in this case.

used by most agencies that examine latent print type evidence," and that it was the same methodology he would use to examine a latent print with friction ridge detail.

[¶ 17] Bickart presented the testimony of her own expert print examiner, Michaud, who testified that although the ACE–V methodology employed by Smith was generally accepted within the scientific community, and "a very small contingency" of latent print examiners, including himself, believe that it is possible that creases could be used as the sole means of identifying a palm print, the application of the ACE–V methodology to palm creases alone was not generally accepted. He testified that Smith's work in the field of palm creases was "unprecedented," but that because there was a lack of training and standards on crease-only identification, most print examiners believe it should not yet be done. Michaud was particularly concerned that a lack of friction ridge detail makes it difficult to understand the sequencing of the palm creases (i.e. the spatial relationship between the creases and their location on the hand). Although he agreed that the ACE–V method was the proper method for photograph analysis, he testified that the hard copies of the photographs of Bickart's hands and the photograph of the abuse he had been provided lacked sufficient clarity to allow him to reach any conclusions with regard to identification.

[¶ 18] It is undisputed that this is the first time this method has ever been applied to a crease-only analysis from a photograph of a palm. Normally, examiners are working with latent finger prints and may use palm creases in conjunction with friction ridge analysis to make an identification of the print. Bickart argued that there are no standards for crease-only identification, and that utilizing creases without accompanying ridge detail is not generally accepted.

### 3. The Trial Court's Evaluation and Decision

[¶ 19] In evaluating the reliability of Smith's testimony, the court correctly noted that we have not adopted the *Daubert*[4] standard applied by federal courts, and it instead applied the *Williams* test for evaluating expert testimony, citing the factors identified in *Searles* as the underlying inquiries for its threshold reliability determination. The court then analyzed the facts before it as they related to each factor.

[¶ 20] In their testimony, the two experts referred repeatedly to what both consider the authoritative text on crease and ridge identification analysis, "Quantitative and Qualitative Friction Ridge Analysis," by David Ashbaugh.[5] Michaud testified that in the text, Ashbaugh expressed concerns about sequencing for crease-only identification. However, Michaud also testified that Ashbaugh asserted that palm creases can be utilized by themselves for identification purposes, and read a passage to the jury from the text to that effect. Both experts discussed in detail the formation of a person's palm creases in utero through birth, and also made reference to another study by Scotland Yard that

---

**4.** In *Daubert v. Merrell Dow Pharmaceuticals,* the U.S. Supreme Court outlined several factors to be considered in evaluating whether testimony is sufficiently reliable to constitute scientific knowledge under the Federal Rules. 509 U.S. 579, 589–95, 113 S.Ct. 2786, 125 L.Ed.2d 469, 480–84 (1993). Bickart argues that this Court should explicitly adopt these standards and contends that the *Williams* test is too broad. We decline this request as we find the current test to provide sufficient guidance, as recently amplified in *Searles.* 2005 ME 94, ¶ 23, 878 A.2d at 516.

**5.** This book was not admitted into evidence, though both experts testified to its contents.

seems to confirm Ashbaugh's findings on the use of creases. The Ashbaugh text also made note of two criminal trials where crease-only analysis was admitted, though it is unclear from the record how much additional corroborative evidence was used in conjunction with the decision to admit the crease testimony. Thus, the trial judge noted:

> I think what we have is a general acceptance that friction ridge analysis if done properly is accepted, that flexion crease analysis if done in conjunction with fingerprint analysis [and] friction ridge [detail] is very useful, and there seems to be an agreement that perhaps in time with care a flexion crease analysis could be used.

The court also acknowledged the lack of peer review on the subject, but noted that the general methodology (the ACE–V method) had been reviewed and accepted.

[¶ 21] In terms of Smith's individual expertise, there was no dispute regarding his qualifications and extensive experience in the area of palm print analysis, and Michaud himself acknowledged the high esteem he had for Smith. The court reasoned, "We did have the benefit . . . of the person who [is] attempting the analysis is a person who has enormous experience, is clearly very very highly regarded in his field, and that's one of the factors . . . to consider." Smith also made reference to the extensive research he had done in the course of teaching certification classes on finger print and palm crease analysis, and it is worth noting that he has taught more than 300 three-day seminars across the country and around the world on this and related subjects. Both Michaud and all the examiners of the Michigan State Police where Michaud is employed have taken Smith's palm print and courtroom testimony courses. Though never published, Smith's studies examined "thousands upon

thousands of inked palm prints." Smith acknowledged that his research never had the specific purpose of crease-only identification, but he testified that "over the years I found out what the different types of creases are, where they happen, what they look like, what the commonalities are and what the uniqueness is and how the uniqueness manifests itself across the palm."

[¶ 22] The trial court also noted that Smith's opinion was tailored specifically to the facts of this case. Other technicians in Smith's lab also did their own analysis of the photographs and came to the same conclusion. It is undisputed that both Smith and Michaud carefully reviewed the specific photographs they received in light of their own expertise.

[¶ 23] In weighing all of the testimony, the trial court concluded that "when it's all weighed and realizing that while general acceptance [is helpful], it's clearly not required, and that one can utilize newly ascertained knowledge or newly applied principles that have not yet achieved [widespread] acceptance if the claim is sufficiently reliable. . . ." The court considered all the evidence before it and concluded that Smith's testimony was sufficiently reliable.

### 4. Appellate Review

[¶ 24] We conclude that the court's reliability determination was reasonable and within the bounds of its discretion for the following three reasons. First, while there is not general acceptance of the identification analysis Smith employed, there is some scientific support, as found in the Ashbaugh text, and from both Smith's and Michaud's testimony, for Smith's opinion that creases may be used by themselves to make an identification. Michaud, Bickart's own expert witness, believed it to be possible.

[¶ 25]   Second, the trial court's decision to place weight on the fact that Smith is one of the most qualified persons in his field to make such a determination was well justified.   Smith has taught classes throughout the United States and the world on palm print analysis (including the utilization of both ridge and crease detail) and has conducted his own extensive research on creases.   Michaud testified that he held Smith in "high regard" and does not "know anybody in the relevant scientific community with respect to latent prints that has the experience in looking at palm prints" that Smith has.

[¶ 26]   Third, Smith's opinion was clearly tailored to the facts of this case.   Smith provided a detailed explanation of the comparison he undertook of the photograph of the hand and the exemplar photograph of Bickart's hand, and explained to the jury how he was able to identify the palm in the photograph of the assault as Bickart's palm using the photographs he received. *Cf. Tolliver v. Dep't of Transportation,* 2008 ME 83, ¶ 35, 948 A.2d 1223, 1234 (holding that an expert witness was not qualified to give an opinion on causation where he lacked training on accident reconstruction and was unfamiliar with the scene of the car crash at issue).

[¶ 27]   We need not and do not decide whether expert opinion testimony based on application of the ACE–V methodology to a photograph of a palm that depicts an individual's creases without ridge detail is generally admissible.   Because our review in this case focuses on the trial court's discretionary call, our conclusion is much more narrow.   On the record before him, the judge acted within his discretion in weighing the relevant factors and concluding that the threshold requirement of reliability had been met.   In addition, the court did not abuse its discretion in concluding that the testimony was relevant and would be helpful to the jury.   As in *Searles,* the court properly treated "the unsettled state of the relevant science as bearing on the weight to be afforded [to Smith's testimony], but not as precluding its consideration by the jury." *Searles,* 2005 ME 94, ¶ 30, 878 A.2d 509, 518. *See also Williams,* 388 A.2d at 505.

## B.   Admission of Photographs

[¶ 28]   Bickart argues that the nude photographs of her and her husband introduced by the State were not relevant because they did not tend to make it more likely than not that she had sexually abused the victim in this case.   Instead, she contends that the photographs constituted improper character evidence under M.R. Evid. 404(a) and should have been excluded.   Bickart further maintains that any probative value the photos might have had was substantially outweighed by the danger of unfair prejudice.

[¶ 29]   The State contends that the photographs were relevant evidence of Bickart's and her husband's habitual behavior "because they demonstrated the existence of a common sexual practice between them which corroborated Stephen['s] ... testimony" and tended to make it more likely that Bickart and her husband took pictures of their sexual abuse of the victim in this case.   The State also argues that any risk of unfair prejudice or confusion of the issues was adequately addressed because only five photographs of Bickart and her husband, out of more than two hundred, were admitted.   We will address in turn the issues of: (1) relevance, (2) character versus habit evidence, and (3) probative value versus the danger of unfair prejudice.

### 1.   Relevance, M.R. Evid. 401 and 402

[¶ 30]   Rule 402 of the Maine Rules of Evidence provides in pertinent part that

"[a]ll relevant evidence is admissible. . . ." Relevant evidence is that evidence having any tendency to make a fact "of consequence" more or less likely. M.R. Evid. 401. When the issue is preserved, we review the trial court's determination of relevance under Rule 401 for clear ·error. *State v. Buchanan,* 2007 ME 58, ¶ 8, 921 A.2d 159, 162.

[¶ 31] The trial court identified two central issues in this case in concluding that the photographs were relevant: first, whether Bickart was involved in committing a sexual act with the victim, and second, whether that activity was photographed. A key part of the case was whether the jury would believe Stephen's testimony about Bickart and her involvement in the incident. As the judge noted, "most jurors if presented with a claim by a convicted sex offender that he and his wife . . . took photographs of sexual activity with the child . . . would find that very, very hard to believe; that first[,] most people don't have sexual activity with kids at all . . . and secondly[,] if they do most people wouldn't photograph that."

[¶ 32] The nude photographs of Bickart and her husband in sexual poses were relevant first, to assess whether Stephen Bickart was telling the truth, because they corroborated his testimony regarding his and Bickart's prior use of the camera in their bedroom for erotic· purposes; and second, to evaluate whether, if Bickart had been involved in the abuse of the victim, she might have participated in taking graphic pictures of it.   ·

2.  Character Versus Habit, M.R. Evid 404(a) and 406(a)

■ [¶ 33] Bickart contends that admitting the pictures to show "that it is in the Defendant's character to take photographs when engaging in sexual practices" is improper character evidence. Rule

404(a) of the Maine Rules of Evidence states that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion. . . ." However, "[e]vidence of the habit of a person . . . is relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit. . . ." M.R. Evid. 406(a). Such habit may be proven by evidence of specific instances of conduct numerous enough to establish that the habit exists. M.R. Evid. 406(b). A court's determination on the issue of habit evidence is reviewed for an abuse of ,discretion. *See, e.g., State v. Libby,* 546 A.2d 444, 449 (Me.1988); *Arel v. Poirier,* 533 A.2d 1285, 1287 (Me.1987).

[¶ 34] The line that differentiates a person's character traits from that person's habitual practices is a difficult one to draw, being more a ·matter of subtle shades than a fixed boundary. In *Arel v. Poirier,* we recognized that in order to constitute admissible habit evidence, the evidence must "describe one's regular response to a repeated specific situation so that doing the habitual act becomes semi-automatic. It is the notion of the invariable regularity that gives habit evidence its probative force." 533 A.2d at 1287 (quoting Adviser's Note, M.R. Evid. 406). Thus, testimony that a person always took sponge baths every night because of a skin condition is permissible habit evidence to show that it was unlikely the person would have taken a regular bath on a particular night. *State v. Libby,* 546 A.2d at 449.

[¶ 35] In this case, the State argued to the jury that "taking pictures of [the victim] [was] totally consistent" with the Bickarts' regular behavior. In the course of its investigation, the State discovered more than two hundred photographs of Bickart and her husband engaged in varying levels

of sexual activity. At trial, Stephen testified that they photographed their erotic episodes "numerous times," and "at least once or twice a week." The record evidence demonstrates that the court acted within its discretion in admitting these photographs as evidence that the photographs showing the sexual acts with the victim were "legitimate [and showed] that this is a couple who is involved in [the] photographing of sexual activity." The admission of the evidence in those circumstances was appropriate pursuant to M.R. Evid. 406(a).

### 3. Probative Value Versus the Danger of Unfair Prejudice, M.R. Evid. 403

[¶ 36] Bickart also contends that even if the photographs were relevant, they should have been excluded because their effect was unfairly prejudicial. Under Rule 403 of the Maine Rules of Evidence,[6] "[a] photograph is admissible if it truly and accurately depicts what it purports to represent, is relevant to some issue involved in the litigation, and its probative value is not outweighed by any tendency it may have toward unfair prejudice." *State v. Kalex*, 2002 ME 26, ¶ 11, 789 A.2d 1286, 1289–90 (citing *State v. Plante*, 623 A.2d 166, 167 (Me.1993)). We review this determination for an abuse of discretion. *Id.* ¶ 10, 789 A.2d at 1289.

[¶ 37] In *Kalex*, we concluded that the trial court did not abuse its discretion when it admitted a photograph showing the defendant in a Ku Klux Klan uniform as probative of whether the defendant's behavior placed the victim in reasonable fear, and that the photograph was not unfairly prejudicial because it was "not gruesome and did not suggest any convic-

tions or other acts unsupported by testimony." *Id.* ¶¶ 8, 13, 789 A.2d at 1289–90. By contrast, in *State v. Thongsavanh*, we determined that evidence of an inflammatory phrase on a defendant's t-shirt should have been excluded where it "was difficult to conceive of a more inflammatory and prejudicial expression" and where the State admitted that the words were "explosive." 2004 ME 126, ¶¶ 8–9, 861 A.2d 39, 42.

[¶ 38] In this case, it is clear that the nude photographs of Bickart do not evoke the level of prejudicial danger presented in *Thongsavanh*. Sexual activity between consenting adults is legal, and erotic photos of an individual, without more, cannot be considered to be inherently "explosive." Further, in *Thongsavanh*, the State made repeated references to the offensive statement, *id.* ¶ 10, 861 A.2d at 42, while in this case the State did not dwell on the photographic evidence other than to make the point that they were evidence of the Bickarts' regular practice.

[¶ 39] The nature of a court's decision on this issue is essentially a balancing act. The guiding principle is that all relevant evidence should be admitted unless any prejudice overwhelms any potentially probative value. *See* M.R. Evid. 403, Commentary in Field & Murray, *Maine Evidence* § 403.1 at 108 (2007). Appropriate to this balancing is consideration of "the significance of the issue the proffered testimony is intended to prove, the availability of other and less prejudicial means of proof, [and] the probable effectiveness of limiting or cautionary instructions," among others. *Id.* We have already discussed the relevance of the proffered evidence. In *Thongsavanh*, the defendant did not dis-

---

6. M.R. Evid. 403 provides in pertinent part, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

pute the issue to which the offending t-shirt was relevant, severely limiting any probative value it might have had. 2004 ME 126, ¶ 9, 861 A.2d at 42. In this case, Bickart clearly contests her participation in and photographing of the incident in question, making this evidence highly probative on that issue. Further, Bickart never offered to stipulate to the existence of the photographs, nor did she request any kind of limiting instruction. Instead, she argued that the State should simply have "made mention of them" or presented evidence of other pornography found in the home to show the sexualized nature of the household. Her argument failed to account for the fact that the photographs were intended in part to corroborate that very testimony from Stephen, and to establish that Bickart herself was directly involved in her and Stephen's regular practice of taking pictures of themselves nude and engaged in sex-related acts in their bedroom. The probative value of the photographs was substantial.

[¶ 40] Criminal juries are frequently required to consider photographic evidence that depicts gruesome, abhorrent or shocking images. That was true in this case with respect to the photographs depicting Bickart and her husband's criminal abuse of their young victim. The abuse photographs stand in marked contrast to the nude photographs Bickart and her husband took of each other. The latter may be unflattering and risk offending the moral sensibilities of some jurors, but they are far from gruesome, abhorrent or shocking. Photographs of adults striking sexually suggestive poses are not likely to overwhelm a reasonable juror's ability to fairly evaluate the *evidentiary significance of the* photographs or, for that matter, the remainder of the trial evidence.

[¶ 41] The trial court acted within its discretion in concluding that the photographs' potential for unfair prejudice against Bickart did not exceed their probative value.

## C. The Marital Privilege

■ [¶ 42] Bickart argues that both the statements and the acts occurring between Bickart and Stephen that were the subject of his testimony were marital communications and that Stephen's testimony regarding those communications should have been excluded pursuant to the marital privilege. We review this decision for an abuse of discretion. *State v. Bates*, 2003 ME 67, ¶ 15, 822 A.2d 1129, 1133.

■ [¶ 43] Title 15 M.R.S. § 1315 (2007) provides that "[t]he husband or wife of the accused is a competent witness except in regard to marital communications." In addition, Rule 504(b) of the Maine Rules of Evidence states that "[a] married person has a privilege to prevent his or her spouse from testifying as to any confidential communication from such person to the spouse." Acts, as well as words, can constitute marital communications where they can reasonably be interpreted as intending to convey a message to the other spouse. *State v. Smith*, 384 A.2d 687, 690 (Me.1978); *see also Bates*, 2003 ME 67, ¶ 17, 822 A.2d at 1133.

■ [¶ 44] The purpose behind the marital privilege is not "served by permitting spouses engaged in criminal activity to raise a shroud of secrecy around their communications regarding that activity. Such communications do not foster the type of honesty and mutual trust upon which fulfilling marital relations ought to be predicated." *Smith*, 384 A.2d at 693. Accordingly, "when both spouses are active participants in ongoing criminal conduct, communications in furtherance of that conduct are not privileged confidential marital communications." *Id.* at 694.

[¶ 45] The communications and acts between Bickart and Stephen during the assault constituted ongoing criminal activity between them, and thus fit squarely within *Smith*.[7] The court did not abuse its discretion in admitting Stephen's testimony describing their criminal activities.

### D. Sufficiency of the Evidence

[¶ 46] Where a defendant alleges that the evidence is insufficient to support her convictions, we view "the evidence in the light most favorable to the State to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense[s] charged." *Pierce*, 2006 ME 75, ¶ 16, 899 A.2d at 804. In addition, "[t]he fact-finder is permitted to draw all reasonable inferences from the evidence, and exclusively decides the weight to be given to the evidence and the credibility to be afforded to the witness." *State v. Drewry*, 2008 ME 76, ¶ 32, 946 A.2d 981, 991 (quotation marks omitted).

[¶ 47] In this case, the jury could have chosen to believe Stephen's testimony that Bickart brought the child to him for the purpose of sexual contact, participated in the contact, and photographed the abuse as evidenced by the exhibits. The jury might also have accepted the expert testimony presented by the State that Bickart's hand was the one depicted in the photograph showing digital penetration of the victim. Bickart's claim that there was insufficient evidence has no merit.

The entry is:

Judgment affirmed.

CLIFFORD, J., with whom MEAD, J., joins, dissenting.

[¶ 48] I disagree with the Court's conclusion that the graphic and lurid naked photographs of Tina Bickart offered by the State and admitted in evidence had substantial probative value. In my view, pursuant to M.R. Evid. 403, any probative value the photographs did have was substantially outweighed by the unfair prejudice to Bickart. Accordingly, I respectfully dissent.

[¶ 49] I agree that the *fact* the photographs were admitted to prove—that Bickart and her husband routinely took pictures of their sexual activity—was very relevant in the unique circumstances of this case, involving, as it did, sexual activity with a very young child and taking pictures of that activity. That Bickart and her husband took sexual photos of themselves, however, could easily have been established in a much less prejudicial way by any number of witnesses, and without the admission of the photographs themselves. Stephen Bickart could and did testify that he and his wife often took photos of their sexual activities. Other, more neutral witnesses also could have testified about the existence of these photos, including the number and the nature of them.

[¶ 50] It is the photographs themselves, of a naked Bickart in lurid sexual poses, that in my view are extremely prejudicial. This case is similar to that of *State v. Thongsavanh*, in which we reviewed the admission in evidence of a t-shirt bearing a particularly offensive and sacrilegious phrase worn by the defendant the night the crime was committed. 2004

---

7. In addition, though not discussed by either party, communications are exempted from the privilege in any case where "one spouse is charged with a crime against the person or property of ... any person residing in the household of either." M.R. Evid. 504(d).

The victim was a child spending the night with the Bickarts on the evening of the alleged incident and arguably may also have been "residing" with them for purposes of this rule.

ME 126, ¶ 3, 861 A.2d 39, 40. The shirt was admitted ostensibly for the purpose of helping witnesses to place the defendant at certain locations during the night of the crime, and to show that the defendant handed over to police a different shirt than the offensive shirt when he was asked for the clothing he had worn on the night in question. *Id.* We noted that disclosure of the phrase on the t-shirt "presented an extremely high danger of unfair prejudice." *Id.* ¶ 8, 861 A.2d at 42. We thus vacated the conviction because the only legitimate and relevant purpose for which the State sought admission of the t-shirt could have been accomplished by the State without disclosure of the highly prejudicial statement on the t-shirt itself. *Id.* ¶¶ 9–10, 861 A.2d at 42.

[¶ 51] Although Bickart's habit or routine of taking photos of her sexual activities could have only been established by Stephen Bickart, the *existence* of the pictures, and their nature, could easily have been testified to by any number of neutral witnesses without the admission and distribution of the photos themselves to the jury. The State overreached in convincing the court to admit the actual photographs. The admission of the lurid photographs of a completely nude Bickart in sexual poses was unnecessary and highly prejudicial. Those photos stripped away her dignity as she sat before the jury, and compromised the presumption of innocence protection to which she was entitled. *See id.* ¶ 10, 861 A.2d at 42 ("When a jury begins a trial with a deep antipathy for the defendant, it is difficult to ensure a fair trial."). When viewed in that context, the unfair prejudice to Bickart far exceeds any probative value the photos might have had, and presents a problem similar to that addressed in *Thongsavanh.* Pursuant to Rule 403, the photos should have been excluded, and because of the serious prejudice the admission of the photos created, that error cannot be said to be harmless.

[¶ 52] I would vacate the conviction.